UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS VAUGHN JACKSON,<br>Plaintiff,<br>v.<br>R. BINKELE, et al.,<br>Defendants. | Case No. 18-cv-04098-EMC<br><br>**ORDER OF SERVICE**<br>Docket Nos. 1, 8, 10, 11 |

## I.     INTRODUCTION

Curtis Vaughn Jackson, an inmate at Salinas Valley State Prison, filed a *pro se* civil rights complaint seeking relief under 42 U.S.C. § 1983, and later filed an amendment to the complaint. The complaint, as amended, is now before the Court for review under 28 U.S.C. § 1915A. Several miscellaneous requests from Mr. Jackson also are before the Court for consideration.

## II.     BACKGROUND

Mr. Jackson alleges the following in his complaint and amendment thereto:

Mr. Jackson was transferred to Salinas Valley State Prison from Mule Creek State Prison in September 2017. While at Mule Creek, Mr. Jackson received several rule violation reports for "indecent exposure with masturbation." Docket No. 1 at 8. As a result of his behavior or the rule violation reports, a "yellow placker" was placed over his cell windows at Mule Creek pursuant to a California Department of Corrections and Rehabilitation policy. Docket No. 1 at 8. Officials at Mule Creek determined to transfer plaintiff to Salinas Valley. Plaintiff wanted to go to a lower security prison in Lancaster because of ongoing violence at Salinas Valley, but Mule Creek officials refused.

Mr. Jackson arrived at Salinas Valley in September 2017. On his first day in the

1 recreational yard, another prisoner recognized him and loudly yelled that Mr. Jackson should not
2 expose himself. Mr. Jackson became angry that the other prisoner had announced Mr. Jackson's
3 inclination toward indecent exposure because the comment put Mr. Jackson in danger. *Id.* at 9.

4 Mr. Jackson appeared before the classification committee at Salinas Valley, on which
5 Captain Gonzalez served as the chairperson. Mr. Jackson told the committee he was not supposed
6 to be housed at this facility because he "was a 270 design an high risk medical." *Id.* at 9 (errors in
7 source). Mr. Jackson also expressed concerns about being housed at Salinas Valley because it had
8 "so many violent sensitive need yard gang banger and plaintiff was already singled out and labeled
9 a sex offender by other prisoner who was housed at Mule Creek with plaintiff." *Id.* at 9-10 (errors
10 in source). Captain Gonzalez refused Mr. Jackson's request to be transferred to another prison.

11 On October 13, 2017, Mr. Jackson went to the recreational yard, where he talked with
12 other inmates "trying to resolve an issue of spreading rumors about plaintiff being an
13 exhibitionist." Docket No. 1 at 10. Inmate McCloud confronted Mr. Jackson; other inmates
14 gathered and took Mr. McCloud's side as Mr. Jackson argued with Mr. McCloud. *Id.* Mr.
15 Jackson "walked up to inmate McCloud and punched him twice in the face." *Id.* at 11. Mr.
16 McCloud backed up and other inmates pulled him away to calm him down. Recreational therapist
17 Schwarz attempted to intervene but other inmates told him to "back off and mind his own
18 business," prompting Mr. Schwarz to back away and not to blow his whistle to alert custody staff
19 to the violent encounter between Mr. Jackson and Mr. McCloud. *Id.* Correctional officer ("C/O")
20 Makela and C/O Rawhoof were present and failed to signal the inmates on the yard to get down.

21 After about 2-3 minutes, inmate McCloud and several other inmates ran up to Mr. Jackson
22 and began beating, kicking, and punching him. "After the prolong[ed] beating," C/O Makela, C/O
23 Rawhoof, and/or recreational therapist Schwarz put the yard down. The guards gained control by
24 shooting a "40 MM, OC instantaneous blast, CN pocket grenade" as most "suspects" fled the area.
25 *Id.* at 12. The only inmates who were "cuff/arrested" were the "popular inmate[s]" who had a
26 history of similar assaultive conduct. *Id.* Mr. Jackson alleges, on information and belief, that
27 defendants "took there time getting the incident under control . . . as a form of punishment for
28 believe plaintiff was the aggressor. *Id.* at 13 (errors in source).

Mr. Jackson suffered several injuries during the fight: abrasions and scratches to his face, knee, and buttocks; a swollen nose; pepper-spray exposure; an injury on the "back side" from having been hit with the projectile from the 40 MM launcher; a torn ACL/MCL; and two fractured ribs. *Id.* at 13.

Psychiatric technician Jah evaluated Mr. Jackson, but Mr. Jackson refused to allow Ms. Jah to take his vital signs. *Id.* Nurse Patty also arrived at the scene. Mr. Jackson told Ms. Jah and nurse Patty that he was in severe pain on his right side ribs and that it was painful for him to breath. Ms. Jah and nurse Patty refused to summon medical assistance at the prison emergency room because Mr. Jackson refused to have his vital signs taken. Nurse Patty cleared Mr. Jackson to return to custody. *Id.* at 14. As a result of the decisions of Ms. Jah and nurse Patty, Mr. Jackson had to wait a few days to be treated. *Id.* at 16.

Mr. Jackson was placed in administrative segregation for participating in a riot. *Id.* at 14. When he arrived in administrative segregation, he notified officials of his pain and was transported to the prison emergency room. A nurse evaluated him and contacted on-call doctors Dr. Michael Mindor and Dr. Phuc Lam. Mr. Jackson makes inconsistent allegations against the doctors: the doctor(s) "denied/delayed treating plaintiff"; ordered x-rays and prescribed Tylenol; "did not know [Mr. Jackson's] medical hist[ory or] if this Tylenol would harm" him; and knew of Mr. Jackson's allergy to Tylenol but "went in[to Mr. Jackson's] medical records and discontinued the allergies alert Tylenol" before prescribing Tylenol. *Id.*

Mr. Jackson had to wait approximately seven days after his x-ray on October 16, 2017 before he received adequate pain medication, morphine, for injuries suffered in the riot. *Id.* at 16. Medical staff later refused Mr. Jackson's request for them to "write a memo about the injuries" he sustained. *Id.* at 19.

Later, when Mr. Jackson's morphine prescription expired, Dr. John Doe again prescribed Tylenol. Mr. Jackson became sickened about two hours after he took two Tylenol tablets. He submitted a medical slip complaining of the problem; a doctor discontinued the Tylenol and prescribed morphine. *Id.* at 20.

On October 19, 2017, Mr. Jackson appeared before an institutional classification

committee, on which chief deputy warden R. Binkele served as the chairperson. Chief deputy warden Binkele and Mr. Jackson argued about Mr. Jackson's involvement in the riot. Chief deputy warden Binkele declined to investigate the riot and other participants in the riot. *Id.* at 16. Captain Gonzalez later refused Mr. Jackson's request to discipline inmate Mosely, who Mr. Jackson believed had fractured Mr. Jackson's ribs. *Id.* at 19.

Mr. Jackson alleges that, before he even arrived at Salinas Valley, there was a long history of problems at Salinas Valley of conditions "posing a substantial risk of serious harm." *Id.* at 18. There was a history of problems "pre-dating the times since turning Delta yard facility into sensitive needs yard of inadequate security staffing and monitoring capacity in overcrowded settings, abandoned security posts, violence by predatory inmates on the recreation yard, unguarded, cellbock causing injuries and fatalities, riot, assaults, battery on staff and inmates, drug overdoses etc. and weapon charges." *Id.* at 18 (errors in source). He also alleges that the inmates who attacked him "all have similar or the same charge violated at Salinas Valley D yard EOP and continues this behavior." *Id.* (errors in source).

Mr. Jackson lists four claims in his complaint: (1) warden Muniz was deliberately indifferent to his safety by failing to protect Mr. Jackson from inmate assaults and placing him on a known unsafe yard; (2) captain Gonzalez and chief deputy warden Binkele were deliberately indifferent to Mr. Jackson's safety by failing to adequately train and investigate inmate violence, thus "letting predators run wild, and promote violence, exposing plaintiff to substantial risk of harm," Docket No. 1 at 23; (3) C/O Makela, C/O Schwarz, and recreational therapist Rawhoof were deliberately indifferent to Mr. Jackson's safety by failing to protect him from inmate violence and delaying in their efforts to stop the riot; (4) Ms. Jah, nurse Patty, Dr. Michael Mindor, Dr. Phuc Lam, and nurse practitioner Rafael Erguiza were deliberately indifferent to his medical needs and engaged in medical malpractice and negligence.

### III. DISCUSSION

A. Review Of Complaint

A federal court must engage in a preliminary screening of any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. *See* 28

4

U.S.C. § 1915A(a). In its review the court must identify any cognizable claims, and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. *See id.* at § 1915A(b).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

1. Deliberate Indifference To Safety

The Eighth Amendment's prohibition of cruel and unusual punishment requires that prison and jail officials take reasonable measures for the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety. *See id.* at 834. To be liable in a failure-to-prevent-harm situation, the official must know of and disregard an excessive risk to inmate safety. *See id.* at 837.

Liberally construed, the complaint, as amended, states cognizable claims against several Defendants for deliberate indifference to Mr. Jackson's safety. A cognizable claim is stated against warden Muniz, chief deputy warden Binkele, and captain Gonzalez based on the allegations that they caused Mr. Jackson to be put in a prison facility knowing that it was unsafe for him. A cognizable claim is stated against C/O Makela, C/O Rawhoof, and recreational therapist Schwarz based on the allegations that they failed to protect Mr. Jackson from other inmates in the yard.

2. Deliberate Indifference To Medical Needs

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim based on inadequate medical care, a prisoner-plaintiff must show: (1) a serious medical need, and (2) deliberate indifference thereto by a defendant. Deliberate indifference may

5

be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*).

Liberally construed, the complaint, as amended, states cognizable claims against several Defendants for deliberate indifference to Mr. Jackson's medical needs. A cognizable claim is stated against psychiatric technician Jah and nurse Patty based on the allegations that they failed to obtain medical assistance for Mr. Jackson, even though he had been injured in the riot and told them he was in severe pain and was having difficulty breathing. A cognizable claim is stated against Dr. Michael Mindoro, Dr. Phuc Lam, and nurse practitioner Erguiza based on the allegations that they failed to timely and adequately treat Mr. Jackson's injuries and pain. A claim is not stated against nurse practitioner Erguiza for refusing Mr. Jackson's request to "write a memo about the injuries plaintiff sustained," Docket No. 1 at 19; the Eighth Amendment does not impose a duty on prison officials to generate evidence for a future lawsuit.

3. State Law Claims

Mr. Jackson invokes the Court's supplemental jurisdiction under 28 U.S.C. § 1367, *see* Docket No. 1 at 27, and alleges that psychiatric technician Jah, nurse Patty, Dr. Michael Mindoro, Dr. Phuc Lam, and nurse practitioner Erguiza engaged in medical malpractice and were negligent in their care of Mr. Jackson. Liberally construed, the complaint, as amended, states cognizable state law claims for negligence and medical malpractice against these defendants.

4. Failure To Transfer To Another Prison

Prisoners have no constitutional right to incarceration in a particular institution. *See Olim v. Wakinekona*, 461 U.S. 238, 244-48 (1983); *Meachum v. Fano*, 427 U.S. 215, 224 (1976). A prisoner's liberty interests are sufficiently extinguished by his conviction that the state may generally confine or transfer him to any of its institutions, to prisons in another state or to federal prisons, without offending the Constitution. *See Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir.

6

1985) (intrastate prison transfer does not implicate Due Process Clause). "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002).

Except to the extent that it reflects deliberate indifference to Mr. Jackson's safety, the refusal of Mr. Jackson's request for a transfer to another prison does not support liability against defendants Binkele and Gonzalez, who presided over classification committee hearings. That is, if Mr. Jackson merely wanted to be at a prison with a lower security level, closer to home, or with better medical facilities, the failure to transfer him to such a prison would not violate any constitutional right. The refusal of his request for a transfer is, however, relevant to his claim that Defendants were deliberately indifferent to a risk to his safety.

B.  Miscellaneous Requests

Plaintiff's request for an extension of the deadline to file a trust account statement in support of his *in forma pauperis* application is GRANTED. Docket No. 8. The trust account statement that was filed is deemed to have been timely filed. The Court will issue a separate order on the *in forma pauperis* application.

Plaintiff's motion to amend the complaint to provide the true names for several Defendants originally sued as Doe defendants is GRANTED. Docket No. 10. The complaint is deemed to be amended by the document at Docket No. 10 that provides the true names for several persons sued as Doe defendants.

Plaintiff filed a motion to expedite consideration of his *in forma pauperis* application and screening of his complaint. The motion is DENIED insofar as he requests "expedited" consideration, although the application and the complaint have been reviewed today in the normal course of court business. Docket No. 11. Plaintiff is now informed that, in addition to complying with all deadlines, one of the most important things for him to do to get prompt consideration of his case is to prepare his documents carefully so that they are complete and correct when he first files them. His requests to extend the deadline to file the trust account statement for his *in forma pauperis* application and his motion to amend the complaint both reflect hurried preparation of the original documents. It unnecessarily consumes scarce judicial resources when the Court must read

multiple filings, such as the five documents (i.e., Docket Nos. 4, 7, 8, 9, and 10) pertaining to the *in forma pauperis* application.

### IV. **CONCLUSION**

1. Liberally construed, the complaint, as amended, states cognizable § 1983 claims against warden Muniz, chief deputy warden Binkele, captain Gonzalez, C/O Makela, C/O Schwarz, recreational therapist Rawhoof, psychiatric technician A. Jah, nurse Patty, Dr. Michael Mindoro, Dr. Phuc Lam, and nurse practitioner Randulf Erguiza. The complaint, as amended, also states cognizable medical malpractice and negligence claims against psychiatric technician A. Jah, nurse Patty, Dr. Michael Mindoro, Dr. Phuc Lam, and nurse practitioner Randulf Erguiza. All other claims and defendants are dismissed.

2. The clerk shall issue a summons and the United States Marshal shall serve, without prepayment of fees, the summons, a copy of the complaint and a copy of all the documents in the case file upon the following individuals, all of whom apparently work at Salinas Valley State Prison:

- Warden M. L. Muniz
- Chief deputy warden R. Binkele
- Captain N. Gonzales (D-facility captain)
- Correctional officer J. Makela
- Recreational therapist W. Schwarz
- Correctional officer K. Rawhoof
- Psychiatric technician A. Jah
- Registered nurse Patty
- Dr. Michael Mindoro
- Dr. Phuc Lam
- nurse practitioner Randulf Erguiza

3. In order to expedite the resolution of this case, the following briefing schedule for dispositive motions is set:

    a. No later than **February 22, 2019**, Defendants must file and serve a motion for summary judgment or other dispositive motion. If Defendants are of the opinion that this case cannot be resolved by summary judgment, Defendants must so inform the Court prior to the date the motion is due. If Defendants file a motion for summary judgment, Defendants must provide to Plaintiff a new *Rand* notice regarding summary judgment procedures at the time they file such a motion. *See Woods v. Carey*, 684 F.3d 934, 939 (9th Cir. 2012).

8

b. Plaintiff's opposition to the summary judgment or other dispositive motion must be filed with the Court and served upon Defendants no later than **March 22, 2019**. Plaintiff must bear in mind the notice and warning regarding summary judgment provided later in this order as he prepares his opposition to any motion for summary judgment.

c. If Defendants wish to file a reply brief, the reply brief must be filed and served no later than **April 12, 2019**.

4. Plaintiff is provided the following notices and warnings about the procedures for motions for summary judgment:

> The defendants may make a motion for summary judgment by which they seek to have your case dismissed. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case. . . . Rule 56 tells you what you must do in order to oppose a motion for summary judgment. Generally, summary judgment must be granted when there is no genuine issue of material fact -- that is, if there is no real dispute about any fact that would affect the result of your case, the party who asked for summary judgment is entitled to judgment as a matter of law, which will end your case. When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(e), that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine issue of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial. *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998).

If Defendants file a motion for summary judgment for failure to exhaust administrative remedies, they are seeking to have the case dismissed. As with other defense summary judgment motions, if a motion for summary judgment for failure to exhaust administrative remedies is granted, Plaintiff's case will be dismissed and there will be no trial.

5. All communications by Plaintiff with the Court must be served on Defendants' counsel by mailing a true copy of the document to Defendants' counsel. The Court may disregard any document which a party files but fails to send a copy of to his opponent. Until a defendant's counsel has been designated, Plaintiff may mail a true copy of the document directly to the defendant, but once a defendant is represented by counsel, all documents must be mailed to

9

counsel rather than directly to the party.

6. Discovery may be taken in accordance with the Federal Rules of Civil Procedure. No further court order under Federal Rule of Civil Procedure 30(a)(2) or Local Rule 16 is required before the parties may conduct discovery.

7. Plaintiff is responsible for prosecuting this case. Plaintiff must promptly keep the Court informed of any change of address and must comply with the Court's orders in a timely fashion. Failure to do so may result in the dismissal of this action for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b). Plaintiff must file a notice of change of address in every pending case every time he is moved to a new facility.

8. Plaintiff is cautioned that he must include the case name and case number for this case on any document he submits to the Court for consideration in this case.

**IT IS SO ORDERED**.

Dated: November 27, 2018

_____
EDWARD M. CHEN
United States District Judge